NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

# THE SUPREME COURT OF THE STATE OF ALASKA

|  |  |  |
|---|---|---|
| STATE OF ALASKA, | ) | |
| | ) | Supreme Court Nos. S-18177/18207 |
| Appellant and | ) | |
| Cross-Appellee, | ) | Superior Court No. 1KE-18-00183 CI |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | AND JUDGMENT* |
| DEBBY WARD, | ) | |
| | ) | No. 2059 – November 20, 2024 |
| Appellee and | ) | |
| Cross-Appellant. | ) | |
| | ) | |

Appeals from the Superior Court of the State of Alaska, First Judicial District, Ketchikan, William B. Carey, Judge.

Appearances: Kevin A. Higgins, Assistant Attorney General, and Treg R. Taylor, Attorney General, Juneau, for Appellant and Cross-Appellee. Leif Thompson, Leif Thompson Law Office, Ketchikan, for Appellee and Cross-Appellant.

Before: Winfree, Chief Justice, and Maassen, Carney, Borghesan, and Henderson, Justices. Winfree, Chief Justice, dissenting.

---

\* Entered under Alaska Appellate Rule 214.

# I. INTRODUCTION

An employee whose employment was covered by a collective bargaining agreement sued for wrongful termination outside of the agreement's grievance and arbitration process. The superior court found the employer discharged the employee without just cause. The employer appeals. The employee cross-appeals, asserting she is entitled to reinstatement. We conclude that the superior court erred in applying the just cause standard and that the employer had just cause to discharge the employee. We therefore reverse the superior court's wrongful discharge determination. In light of this, we do not address the employee's cross-appeal regarding remedies.

# II. FACTS AND PROCEEDINGS

## A. Investigation And Discharge By The State Of Alaska

Debby Ward worked for nearly 15 years for the Alaska Marine Highway System (AMHS), a division of the State of Alaska, Department of Transportation and Public Facilities (State) that operates the State's ferry vessels. The State employed Ward as a Chief Purser at the time of her discharge. The terms and conditions of Ward's employment were governed by a collective bargaining agreement (CBA) negotiated between the State and the union that represented Ward. Under the CBA employees living in Alaska could receive Cost of Living Differential premium pay (COLD pay).

For Ward to be eligible for COLD pay, she needed to maintain both her state residency and her "principal place of abode" in Alaska.[1] The CBA required Ward

---

[1] Under Rule 17.01 of the CBA an employee receiving COLD pay must meet the requirements of AS 23.40.210. Alaska Statute 23.40.210(b) provides that only a "state resident" is eligible for COLD pay. Alaska Statute 23.40.210(e) defines "state resident" to mean:

> an individual who is physically present in the state with the intent to remain permanently in the state under the requirements of AS 01.10.055 or, if the individual is not physically present in the state, intends to return to the state and remain permanently in the state under the requirements

to annually file proof of eligibility that she was entitled to COLD pay. Ward provided proof of eligibility for COLD pay upon hire in 2003. The State and the union subsequently agreed that the State could cross-reference an employee's Permanent Fund Dividend (PFD) application and allow those employees who received a PFD to receive COLD pay without applying annually. The CBA notified Ward that the State could "require . . . additional documentation to support claims of eligibility for [COLD pay]." The CBA also required Ward to notify the State when relocating her principal place of abode "in a manner which affects eligibility for COLD [pay]."

In April 2016, the State received a tip from another AMHS employee suggesting that Ward no longer lived in Alaska. Over the next month, the State evaluated the credibility of the report by reviewing Ward's PFD application records, public court records, and social media. An investigator for the State found public court records indicating Ward sought court permission to relocate her grandchildren, of whom she had custody, to Wyoming. The investigator also found information indicating Ward may own a business in Wyoming. In response, the State expanded its investigation into Ward's COLD pay eligibility.

In May the investigator requested that Ward submit a new application for COLD pay, and copies of her utility bills, rent or home mortgage statements, Alaska Airlines flight reservations for departure from the state during the previous year, state hunting and fishing licenses, vehicle registrations, and her Alaska driver's license and voter registration card. In early July Ward provided a new COLD pay application, as well as many of the requested documents with handwritten notes indicating the purpose of certain trips. Noting perceived inconsistencies and missing travel documentation, the investigator requested more information. In this second request, the investigator asked that Ward provide her flight information for *all* airlines she used the prior year,

---

of AS 01.10.055 and is absent only temporarily for reasons allowed under AS 43.23.008 or a successor statute.

as well as information about any out-of-state homes or businesses and a vehicle Ward had shipped out of state.

Ward provided additional travel statements based on this second request, along with documents about land Ward owned in Wyoming, tax documents for a Wyoming business, and handwritten notes contextualizing the documents. The investigator reviewed these documents and conducted additional research on the Wyoming property and business. Through use of online maps, the investigator was able to observe structures and a recreational vehicle at the Wyoming address to which Ward had sought to relocate her grandchildren. She also found business records Ward had not disclosed, and discovered that Ward's grandchildren had been registered for school in Wyoming, rather than Alaska, for the prior school year. The new information prompted a formal investigation into whether Ward acted dishonestly during the investigation.

The State subsequently interviewed Ward twice, once in February and once in July 2017, with a union representative in attendance as required by the CBA. During the first meeting, Ward asserted Alaska was her home and she intended to remain in Alaska. Ward also told the investigator that the business property in Wyoming had a small apartment, and that the family was in the process of adding some bedrooms, but that she did not live there or consider it a home. Ward stated that she and her husband owned motor vehicles Outside and that all but one was either being serviced, given to family, or put up for sale. She stated that she and her husband owned two all-terrain vehicles and a recreational trailer in Wyoming, and that the trailer was not currently registered and was merely parked on the Wyoming property. Ward also stated that she and her husband shared primary physical and joint legal custody of her grandchildren, and that while her husband and grandchildren lived in Wyoming, she did not live with them. The investigator informed Ward she saw inconsistencies in the information Ward provided and that she believed it unlikely that Ward had custody of her four grandchildren but was not living with them in Wyoming.

After the first meeting the investigator requested that Ward provide additional information, including tax records and documentation regarding the building in Wyoming and another business Ward's husband owned. Ward provided additional documentation that indicated the Wyoming property had been renovated into a four-bedroom apartment where her grandchildren now lived. The investigator received a copy of Ward's 2015 custody motion to relocate her grandchildren to Wyoming and learned that Ward's Ketchikan home was for sale.

At the second meeting the investigator asked Ward about the custody motion she had filed indicating that she wanted to move to Wyoming with her grandchildren. Ward had certified the motion as "true to the best of [her] knowledge and belief" and stated therein:

> I, Debby Ward, request that: I be granted permission to vacation outside of Ketchikan with all 4 children . . . during the month of July 2015. Also want to move & relocate to Gillette, Wyoming starting August 13, 2015.
> . . . .
> . . . Also, we own property and a home in Gillette, WY . . . . I would like permission to move and relocate before the '15-'16 school year starts.

Ward asserted her stated plan to move was a typographical error. She stated she intended for her grandchildren to relocate, not herself. Her grandchildren were school-age, ranging from pre-school to junior high school, but Ward contended that her intention was only to travel with them and her husband to Wyoming and then to return to Alaska to live and work for AMHS. As to her Ketchikan home, Ward said she was selling it to downsize and that her belongings were in the garage. Ward stated she believed she submitted everything requested and was not trying to mislead the investigator.

Following a report from AMHS, the Department of Revenue, PFD Division began a concurrent investigation into the eligibility of Ward and her grandchildren to receive a PFD in 2016. In December 2016, the Division denied PFD

applications for Ward and her grandchildren for insufficient presence in Alaska. Ward initiated an informal appeal, and in June 2017, that appeal concluded Ward was ineligible for the PFD because her custody motion disclosed that she was a resident of another state, and that she had "intentionally provided deceptive information in her 2016 PFD application by failing to disclose reportable absences[.]" Subsequently, the State's investigator learned of the PFD Division's denial and investigation into Ward's PFD application. In July 2017, Ward submitted a written statement to the investigator regarding her denied PFD. Ward stated: "I have chosen not to partake in the PFD because I do not intend to remain indefinitely as PFD asks."

In August 2017, after consultation with the investigator and other human resource personnel within both the Department of Transportation and the Department of Administration, Ward's supervisor and the head of AMHS decided to discharge Ward for dishonesty, one of the permitted reasons under the CBA for "immediate discharge."[2] The discharge letter listed six reasons for the State's decision: (1) Ward's failure to initially disclose her home in Wyoming, (2) her failure to disclose information about her businesses after being asked to provide business information, (3) her failure to disclose Alaska vehicles registered in her name located in Wyoming, (4) her mischaracterizing her Wyoming property, (5) her claiming that Wyoming was not her principal place of abode when she "filed a sworn statement with the [state] court outlining [her] desire and intent to relocate [her] home and four grandchildren" to their home in Wyoming, and (6) her claiming that Ketchikan was her home while her house was up for sale. The letter also referenced Ward's PFD denial due to her failure to meet the Alaska residency requirement. The letter explained that:

> [Ward was] evasive and not forthright during the COLD investigation . . . . Based on the available evidence, including [Ward's] testimony and explanations, [the State]

---

[2] The letter also determined that based on the preponderance of evidence Ward was ineligible for COLD pay "since at least 2015."

concluded that [she] provided misleading information resulting in a monetary benefit [she] would not otherwise have been entitled to receive. [Her] behavior was determined to be deceptive.

The letter advised Ward that for those reasons she was "dismissed effective immediately."

### B. Ward's Union Grievance And Lawsuit

The union filed a grievance asserting the State lacked just cause to terminate Ward, violating the CBA. But the union filed the grievance after the CBA's required deadline. The State denied the grievance as untimely, and the union did not invoke arbitration.

Ward subsequently filed a complaint for wrongful termination in superior court.[3] The court held a three-day bench trial, hearing evidence offered by both the State and Ward to develop a factual record. At issue was whether the State had "just cause" to discharge Ward as required by the CBA.[4] The CBA did not define just cause. Citing *Braun v. Alaska Commercial Fishing & Agricultural Bank*,[5] the State asserted that just cause existed because it did not discharge Ward for a reason that was "arbitrary, capricious, or illegal," and that its decision was "based on facts, supported by substantial evidence, reasonably believed by [it] to be true" and the role of the court was to review the State's determination for "substantial evidence." Ward contended that the superior court "[sat] in the role of an arbitrator" with its standard of review determined by the CBA, and that the State lacked just cause because the evidence demonstrated she "did not mislead [the State]."

---

[3] Typically Ward's grievance would have been resolved by arbitration as required by the Alaska Public Employment Relations Act. AS 23.40.210(a).

[4] The court found that Ward was excused from utilizing the CBA's grievance procedure and could sue in superior court. The State did not contest this ruling on appeal.

[5] 816 P.2d 140, 142 (Alaska 1991).

The court determined that it was not required to give deference to the State's determination about Ward's dishonesty during the investigation. It concluded that it "should have full reign [sic] to make factual determinations and independently assess whether [the State] had just cause to fire [Ward]," and that her "case should be treated as any other civil matter." The court ultimately concluded that: the State discharged Ward without just cause because it lacked substantial evidence to support its finding that Ward engaged in dishonesty; the State's belief that Ward engaged in dishonesty was unreasonable; and the COLD pay eligibility requirement prompting the investigation was arbitrary.

In its review for substantial evidence, the court analyzed the six bases for just cause that the State articulated in Ward's discharge letter. The court found that the State lacked substantial evidence for each. Because several of the reasons overlapped, the thrust of the court's reasoning focused on the narrow framing of the investigator's inquiries and requests for documents. The court observed the investigator's narrowly framed questions, as well as Ward's responses providing only exactly what was asked, and determined that the nature of this back-and-forth led to much of the "confusion and contention between the parties."

The court accepted Ward's claim that the custody motion she had filed was inaccurate and that, in spite of her grandchildren's move to Wyoming, she did not reside primarily in Wyoming. Moreover, the court found that Ward acted in good faith in her responses to the investigator, providing the materials asked of her and inquiring about what additional information the investigator wanted. The court did not give weight to the PFD Division's denial of Ward's PFD application for herself and her grandchildren, reasoning that PFD eligibility is based on residency, not principal place of abode.

Based on its findings, the superior court concluded that the State lacked just cause to terminate Ward. The court thereafter held a separate hearing regarding

remedies. During the hearing Ward stated she did not seek reinstatement to her former position, and the court eventually awarded monetary damages.

The State now appeals, arguing that the superior court erred both in its application of the just cause standard and in its determination that the State lacked substantial evidence, and the reasonable belief in that evidence, necessary to support its discharge of Ward. Ward cross-appeals, arguing that the court abused its discretion by denying reinstatement as a remedy.

## III. STANDARD OF REVIEW

"We review questions of law," including whether the superior court applied the correct legal standard, "using our independent judgment."[6] "Whether an employee was terminated for just cause or for an illegitimate reason is a question of fact . . . ."[7] When reviewing the determination whether an employee was terminated for just cause, we have typically contemplated an administrative decision of that question, along with an administrative record through which the parties have been permitted to develop facts.[8] In such cases, where there has been an administrative decision and the superior court has acted as an intermediate court of appeal reviewing that decision, we review the administrative decision directly for substantial evidence.[9] Here, however, where the matter did not proceed to arbitration or to a full administrative hearing and determination, the superior court acted as the fact-finder, and we review the superior court's findings and conclusions rather than those of an administrative

---

[6] *See Jurgens v. City of North Pole*, 153 P.3d 321, 325-26 (Alaska 2007) (citing *Romulus v. Anchorage Sch. Dist.*, 910 P.2d 610, 615 n.3, 618-19 (Alaska 1996)); *see also Cassel v. State, Dep't of Admin.*, 14 P.3d 278, 282 (Alaska 2000); *cf. O'Connor v. Star Ins. Co.*, 83 P.3d 1, 3 (Alaska 2003) (applying independent judgment "when reviewing a [trial] court's interpretation of statutes and other related legal questions").

[7] *Cassel*, 14 P.3d at 282.

[8] *See e.g., id.*; *Jurgens*, 153 P.3d at 325-26.

[9] *Cassel*, 14 P.3d at 282; *Jurgens*, 153 P.3d at 325.

agency. Given the superior court's role as the initial adjudicator, we review the court's factual findings for clear error.[10] We conclude findings are clearly erroneous "when we are left with a definite and firm conviction based on the entire record that a mistake has been made."[11]

## IV. DISCUSSION

The parties' arguments have evolved to some extent since the time of their respective appeals. The parties originally appeared to disagree about whether the superior court could hold proceedings to develop the factual record surrounding the State's investigation and termination of Ward, as well as about what standard the superior court needed to apply in reviewing Ward's termination. By the time of oral argument before us, though, the parties appeared to agree that the superior court could hold proceedings to develop the factual record because no administrative hearing had occurred, and both parties advocated that the court needed to apply the just cause standard we articulated in *Braun v. Alaska Commercial Fishing & Agriculture Bank* to determine whether Ward was properly or improperly discharged.[12]

The State asserts that the superior court did not correctly apply the *Braun* standard. Ward contends it did. We conclude that although the superior court correctly

---

**10** *See Casey v. Semco Energy, Inc.*, 92 P.3d 379, 382 (Alaska 2004) (citing *Vezey v. Green*, 35 P.3d 14, 20 (Alaska 2001)); *cf. Lake & Peninsula Borough Assembly v. Oberlatz*, 329 P.3d 214, 221 (Alaska 2014) (applying clear error standard of review to superior court's factual findings following trial de novo under Alaska Appellate Rule 609(b)).

**11** *Casey*, 92 P.3d at 382.

**12** 816 P.2d 140, 142 (Alaska 1991) ("[A] discharge for 'just cause' is one which is not for any arbitrary, capricious, or illegal reason and which is one based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true." (alteration in original) (quoting *Baldwin v. Sisters of Providence in Wash., Inc.*, 769 P.2d 298, 304 (Wash. 1989))). Given the manner in which the matter has been litigated before the superior court and before us, we examine the superior court's application of the "just cause" standard as it is articulated in *Braun*.

identified the *Braun* just cause standard for its review of Ward's termination, the court nonetheless failed to correctly apply the standard. We therefore reverse the superior court's determination that the State lacked just cause in terminating Ward.

The *Braun* just cause standard permits an employer to discharge an employee for a reason that is not "arbitrary, capricious, or illegal" and that is "based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true."[13] An employer's decision that discharge is warranted must be made in good faith and objectively reasonable.[14] Substantial evidence exists when, in light of the whole record, "reasonable minds might accept the [decision]."[15] Whether a quantum of evidence is substantial is a legal question.[16]

Here, although the superior court cited *Braun*'s just cause standard, the court discounted the substantial evidence of dishonesty before the State when it terminated Ward and failed to consider the reasonableness of the employer's belief that Ward had been dishonest in light of that evidence. Rather than examining whether the employer acted on substantial evidence and the reasonableness of the employer's belief in light of that evidence,[17] the superior court appeared to conduct its own de novo analysis of whether Ward was dishonest and should have been terminated.

We emphasize that the superior court's role, given the *Braun* standard, was not to decide whether Ward was dishonest, or what Ward's principal place of abode was, although those questions are related to Ward's termination. Rather, the court's role was to analyze the State's reason for dismissing Ward, whether the information gathered by the State was sufficient such that a reasonable person could conclude that

---

[13]     *Braun*, 816 P.2d at 142.

[14]     *Jurgens* 153 P.3d at 334 (citing *Cassel*, 14 P.3d at 284).

[15]     *Cassel*, 14 P.3d at 282.

[16]     *Id.*

[17]     *See Jurgens*, 153 P.3d at 325.

Ward was dishonest, and whether the State reasonably believed the information that it relied upon.

> **A.      Applying The *Braun* Standard, Substantial Evidence Existed For The State To Discharge Ward For Dishonesty.**

The State argues that had the superior court properly applied *Braun*, the court would have concluded that substantial evidence supported the State's discharge of Ward.  Ward disagrees, contending that the superior court correctly determined that Ward was forthright throughout the State's investigation.  We agree with the State that the just cause standard required the superior court to assess whether substantial evidence supported the State's belief that Ward had acted dishonestly, and that such evidence existed in this case.[18]

We begin by acknowledging that this is a close case.  In many ways, Ward was quite responsive during the course of the COLD pay investigation, providing extensive information and documentation in answer to the investigator's questions and requests.  At the investigation's start, the investigator asked Ward for a series of financial and travel records — Ward provided them.  Later, the investigator asked for additional documents — Ward provided those too.  Notably, Ward's family members were not within the scope of these initial requests.  Questions related to Ward's family, and indicia of their move away from Alaska, arose later, after the investigator received information from other sources tending to show that Ward's school-age grandchildren, of whom she had custody, no longer resided in Alaska.  Where the superior court discerned a "shifting goalpost" with the change in focus and scope of the investigation, another could reasonably perceive a developing investigation.  Ward's disclosures and statements to her employer that she intended to reside in Alaska conflicted with the

---

[18]      Ward's complaint did not contend that termination for dishonesty was an arbitrary reason under *Braun*, and conceded it was expressly permitted in the CBA.

additional evidence tending to show the opposite. And that additional evidence was substantial.[19]

The facts developed by the State during its investigation, considered both at the time of Ward's termination and in light of information developed during trial, were sufficient to support a reasonable belief that Ward acted dishonestly during the State's investigation into her eligibility for COLD pay. Ward expressly stated during the investigation that she intended to remain living in Alaska, and thus eligible for COLD pay — even though she had previously informed an Alaska court in a custody matter involving her grandchildren that she wished to move and relocate the family to Wyoming as of August 2015 and that "we own property and a home in Gillette, WY." And when initially confronted with the 2015 court filing, which she signed as "true to the best of [her] knowledge and belief," Ward's only response was that the indication that she would be relocating was a typographical error. When previously questioned about the existence of this property, Ward initially stated it had a small manager's apartment, and that her family was in the process of adding bedrooms, but that she did not consider it a home. It was only after Ward provided additional documents, requested by the investigator in response to Ward's statements about the Wyoming property, that the investigator learned the property had been expanded to "a four bedroom, two and a half bathroom apartment with a family area and [] kitchen," and that Ward's grandchildren had been living there. Indeed, Ward's grandchildren had been attending school in Wyoming since the prior school year.

Additionally, prior to Ward's termination, a separate division of the State, the Department of Revenue, PFD Division, investigated Ward's eligibility to receive a PFD in 2016 and ultimately denied her PFD application for insufficient presence in Alaska. And Ward's informal appeal of that denial led to the Division's determination that Ward was a resident of another state and that she "had intentionally provided

---

[19] *See Cassel*, 14 P.3d at 282.

deceptive information in her 2016 PFD application by failing to disclose reportable absences." While the court observed in a footnote that the outcome of the PFD investigation "was available" to the State in considering whether Ward had been dishonest during the COLD pay investigation, it discounted this evidence and omitted it from its analysis of whether the State's conclusion that Ward had been dishonest was supported by substantial evidence. But Ward's COLD pay application put her on notice that information about her PFD application was relevant to whether or not she was entitled to COLD pay. And the conclusions by the PFD Division about her PFD eligibility were certainly relevant to whether Ward intended to remain a resident of Alaska during the time period at issue, whether she was eligible for COLD pay during that period, and whether she was deceptive during the ensuing investigation.

Here, the superior court was not tasked with making its own determination about whether Ward was dishonest and should be terminated. Rather it was required to consider the State's evidence, in light of facts developed during trial, to determine whether substantial evidence supported the State's conclusion that Ward was dishonest during the course of the COLD pay investigation, and whether the State's belief in that evidence was reasonable. That is the proper test for substantial evidence.

Our appellate review for substantial evidence is limited. We must determine whether "evidence *detracting* from the [employer's] decision [was] *dramatically* disproportionate to the evidence supporting it such that [one could not] 'conscientiously' find the evidence to be 'substantial.' "[20] This is not a case in which the evidence supporting a finding of just cause is overshadowed by evidence to the contrary. Examining the record as a whole, a reasonable person could conclude from these facts that Ward had been dishonest about her Wyoming home and residing in

---

[20]     *See Pub. Safety Emps. Ass'n v. City of Fairbanks*, 420 P.3d 1243, 1248 (Alaska 2018) (emphasis in original) (quoting *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 634 n.40 (Alaska 2011)).

Wyoming during the COLD pay investigation. Accordingly, we conclude that substantial evidence existed to support the State's determination that it had just cause to discharge Ward for dishonesty.[21]

### B. The Record Supports The Reasonableness Of The State's Belief That Ward Behaved Dishonestly During Its Investigation.

Particularly given the substantial evidence supporting the facts relied upon by the State, outlined above, the record supports the reasonableness of the State's belief that Ward behaved dishonestly during the course of its investigation of her eligibility for COLD pay. The requirement under *Braun* that an employer must have substantial evidence of the reason it discharged an employee is a distinct but related concept to its requirement of a good faith and reasonable belief that the evidence supporting the discharge is true.[22] Here the parties do not dispute that the State's investigation complied with the minimum procedural standards required under the CBA. Rather, Ward contends, and the superior court found, that the tenor of the State's investigation rendered unreasonable its belief that Ward had behaved dishonestly.

While the State's investigation was not without flaws, the evidence tending to demonstrate that Ward behaved dishonestly during the COLD pay investigation also supports the State's assertion that it reasonably and in good faith believed that Ward had been dishonest. Although the superior court did not directly explain as much, its analysis of the tenor and competency of the State's investigation appears to address the question here whether the State reasonably believed that Ward had behaved dishonestly. In particular, the court seemed to be addressing the reasonableness of the State's belief when it found that the State's investigator had "a pre-determined disposition to find that [Ward's] primary place of abode was not in the

---

[21] We do not address whether the superior court correctly analyzed Ward's eligibility for COLD pay.

[22] *See Braun v. Alaska Com. Fishing & Agric. Bank*, 816 P.2d 140, 142 (Alaska 1991).

State of Alaska" and did not appear to listen to or consider Ward's "explanations or testimony."

The State does not refute the court's finding that the investigator held a "confirmation bias." Instead, the State argues that the court "placed undue emphasis" on that finding and that the significant evidence of Ward's move out of state supports the reasonableness of its belief that Ward acted dishonestly during the State's investigation. Of course one could imagine instances wherein a limited or shallow investigation produces seemingly strong evidence of misconduct, when a thorough investigation might have developed exculpatory or explanatory evidence. But the superior court's assessment here overlooks the nature and strength of the evidence informing the State's investigation, including Ward's own statements about the relocation of her family and about her PFD eligibility. Given the nature of the evidence the State relied upon, we agree that the reasonableness of the State's belief that Ward behaved dishonestly was not undermined by faults in the State's investigation.

Again, Ward's own statements in court motion work that she had a "home" in Wyoming and intended to "move [and] relocate" there with her grandchildren can reasonably be viewed as belying her assertions during the investigation that she continued to live in Ketchikan during the relevant period and intended to continue residing in Alaska. These contradictory statements, about where she intended to live and the character of her Wyoming property, stand apart from any confusion or bias by the investigator. It was reasonable for the State to give Ward's own written assertions to an Alaska court in an important child custody matter great weight in its investigation. The State could reasonably conclude that Ward's own

written assertions demonstrated her intent to live and reside outside Alaska, and that she was dishonest when she claimed otherwise during the investigation.[23]

While the difficulties in the State's investigation do not undermine the reasonableness of its conclusion that Ward was dishonest in this context, we note that the State's contention that the court could not critique its investigation is inaccurate. Had the evidence supporting just cause for termination in this matter been more tenuous, the theory that the State's investigation was tainted by bias would be more compelling. Under different facts, an investigator's exercise of confirmation bias may certainly spoil an investigation and demonstrate a lack of reasonable and good faith belief that the evidence is true.[24] But that is not the record before us here.

Here, given the nature of the evidence that the State relied upon, the investigator's confirmation bias did not undermine the reasonableness of the State's belief that Ward had engaged in dishonesty. Further, the decision to terminate Ward was not made by the investigator. Rather, it was a collective decision by AMHS leadership after consultation with the investigator and others. Nothing in the record indicates that the group making the termination decision shared the investigator's bias or that such bias should be imputed. To the extent the superior court deemed the State's belief of the evidence supporting its termination decision unreasonable, that determination fails to account for the nature of the information the State relied upon.[25]

Given that Ward's termination was based on facts supported by substantial evidence and reasonably believed by the State, we conclude the State had just cause to discharge Ward. In light of that conclusion, we do not address Ward's cross-appeal seeking reinstatement.

---

[23] *See Crowley v. State, Dep't of Health & Soc. Servs.*, 253 P.3d 1226, 1231 (Alaska 2011) (holding accuracy of employer's investigative findings not bad faith "as long as the employer had substantial reason to believe that misconduct occurred").

[24] *See Cassel*, 14 P.3d at 284.

[25] *See Casey v. Semco Energy, Inc.*, 92 P.3d 379, 382 (Alaska 2004).

## V.    CONCLUSION

We REVERSE the superior court's determination that the State's discharge of Ward was without just cause.

WINFREE, Chief Justice, dissenting.

I respectfully disagree with the court's analysis and conclusion that the superior court's decision — that the State wrongfully terminated Debby Ward's employment — should be reversed. The court's conclusion is based on its view that, notwithstanding both the superior court's (1) detailed findings of fact reached in the face of conflicting evidence and necessary credibility determinations, and (2) reasonable inferences actually drawn from those findings of fact to reach its decision, the superior court misapplied law set out in *Braun v. Alaska Commercial Fishing & Agriculture Bank* (*Braun*).[1]

This appeal arises from a judge-tried case. As the court notes in its Standard of Review section, the superior court was the fact-finder at trial and its findings of fact are subject to reversal as a matter of law only if clearly erroneous. But the court does not conclude that any of the superior court's factual findings are clearly erroneous, so those factual findings must be accepted as true for our appellate review. Moreover, the court fails to grapple with — and, indeed, ignores — applicable law requiring that we view those factual findings in the light most favorable to upholding the superior court's decision.[2] The court instead makes its own contrary inferences from the superior court's findings of fact in favor of ruling for the State.

Relevant portions of the superior court's decision are attached as an Appendix for ease of reference. I need make only the following limited observations. First, although the court contends that the superior court failed to engage in the necessary analysis, the supposed missing analysis can be found at Appendix pages 33-

---

[1]     816 P.2d 140 (Alaska 1991).

[2]     *Stumbaugh v. State*, 599 P.2d 166, 173 n.15 (Alaska 1979) (referring to "general rule that on appeal, facts are viewed in the light most favorable to sustaining the judgment"); *id.* at 172-73 (applying that rule to reviewing denial of evidence suppression motion and to reviewing conviction for sufficiency of supporting evidence).

35 and 39-41, fully supported by the superior court's accompanying recitation of factual findings and analysis of a wider range of the State's factual and legal positions at trial. Second, the superior court's factual findings matter, particularly with respect to the superior court's analysis of the State's flawed investigation into Ward's principal place of abode.

The superior court found, factually, that the investigation "had a pre-determined disposition to find that Ward's primary place of abode was not in Alaska, *and* that it skewed the evidence presented [by Ward] in a manner that would ultimately support and confirm that conclusion." Appendix, pp. 37-38 (emphasis added). The superior court expressly noted the investigator's deliberate misrepresentation that Ward's Ketchikan house was vacant. Appendix, p. 38. And it previously had found that the investigator repeatedly changed her working definition of "principal place of abode" as Ward provided requested information to her, while at the same time attempting to mislead Ward into believing the working definition was supported by statutes and regulations. Appendix, pp. 26-31. The superior court described this as a "shifting goalpost" and noted that in reality the definition was left to the investigator's whim. Appendix, pp. 28 and 31.

The court contends that the superior court's "shifting goalpost" can reasonably be seen as a mere evolving investigation. But the trier of fact found otherwise, and the court does not attempt to explain away the investigator's astoundingly shape-shifting standard for determining Ward's principal place of abode. In context with the superior court's related findings, particularly that the investigator skewed Ward's evidence to support her position that Ward was evasive and dishonest, it is clear that the superior court found that the use of a shape-shifting standard for determining Ward's primary place of abode was part and parcel of why there was not substantial evidence to support Ward's termination and why the State did not have a reasonable belief in the validity of its reason for Ward's termination.

The court further contends that, even if the investigator had been predisposed to conclude that Ward was evasive and dishonest, nothing in the record suggests that the ultimate decision makers were predisposed or biased against Ward. But the court does not dispute that the investigator presented her investigation results and her conclusions to the panel or that the panel consulted with her in the termination decision. The court instead concludes that, under "different facts" an investigator's "confirmation bias" might spoil an investigation and the reasonableness of relying on it, but not on the record in this case. But the record in this case contains an explicit finding of fact by the superior court, which the court does not suggest is clearly erroneous, that the investigator deliberately skewed Ward's information to conform to her predetermined conclusion. Appendix, pp. 37-38. That deliberately skewed information was presented to and relied upon by the decision makers in this case; it *is* the record in this case.

In my view, the superior court thoroughly evaluated the competing evidence presented by the parties, made relevant credibility determinations, made findings of fact and drew reasonable inferences from those findings of fact, and discussed and correctly applied *Braun*. The superior court eviscerated the State's factual and legal arguments point by point and correctly concluded that substantial evidence did not support the State's stated reasons for terminating Ward's employment. I would affirm the superior court's decision (although I would remand for further proceedings on Ward's potential reinstatement or calculation of post-trial damages arising from the wrongful termination).

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

FIRST JUDICIAL DISTRICT AT KETCHIKAN

| | | |
|---|---|---|
| DEBBY WARD, | ) | |
| | ) | Case No.  1KE-18-00183 CI |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| STATE OF ALASKA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DECISION AND ORDER[*]

## INTRODUCTION

Debby Ward brought suit against the State of Alaska, Alaska Marine Highway System (AMHS), asserting that she was wrongfully terminated from her position on the basis of what AMHS claims were dishonest statements related to her residency for the purpose of receiving a Cost of Living Differential (COLD) afforded to AMHS employees whose "principal place of abode" is Alaska.  A three-day court trial was held before the undersigned judge in December, 2019 after the court's previous denial of a motion for summary judgment filed by AMHS.  AMHS offered a series of defenses to Ward's claims, which are addressed in sequence below.  The following comprises the court's determination as to the liability issues presented.

---

[*]     This decision has been edited to conform to technical rules of the Alaska Supreme Court, to eliminate unnecessary references to some individuals' names, and to correct minor typographical errors.

**[DISCUSSION]**

. . . .

**II.     Whether AMHS fired Ward for just cause.**

**FACTS**

   **A.     Cost of Living Differential**

On direct examination, Shanna Burns, a human resources officer for the Department of Transportation and the lead investigator in this case, explained that the COLD is a geographical pay difference between employees living in Seattle, Washington and Alaska.  It costs more to live in Alaska, so Alaskan employees get paid a higher rate than their lower 48 counterparts.  Burns testified that in order to receive COLD benefits, an employee's principal place of abode must be in Alaska.  Defining principal place of abode, determining its objective criteria, and explaining what documentation a COLD applicant needs to provide to prove that Alaska is the applicant's principal place of abode, has been a complicated and contentious issue in this case, as the following facts demonstrate.

   **B.     Ward's COLD Investigation**

Burns testified that on April 20, 2016, Kevin Staples,[1] an employee with AMHS contacted her.  Staples told Burns that he lived across the street from Ward's house in Ketchikan and believed that she may have moved out of state.  Ward received COLD pay for her work with AMHS for living in Alaska.  Burns testified that she looked to see if this allegation had any merit before initiating the COLD investigation.

---

   [1]     Ward testified that she got into some trouble with AMHS for a stowaway incident in the past.  Staples was in charge of the disciplinary hearings in that case.  Ward testified that it was clear to her that Staples wanted her fired because the predetermination hearings in the stowaway case were hostile.  Even though Ward was found not guilty and returned to work at AMHS, she feels that this COLD investigation is in part retaliation for the stowaway incident because of Staples's involvement.

Burns cross referenced with Permanent Fund Dividend (PFD) information to see if Ward received her PFD for that year. She looked on Google, social media, and CourtView. At this time, Burns knew that Ward had primary custody of her grandchildren and the Hill children, and that she potentially had a business outside of Alaska. Burns decided that there was merit to the allegation that Ward's principal place of abode was not Alaska, so she sent Ward a letter requesting information.

### 1. May 13, 2016 Request for Information

The May 13 letter requested:

> . . . a copy of each as they apply or any other information that may support your claim that Alaska is your primary place of abode:
>
> - COLD application
> - Alaska Airline statement for all travel from May 2015 to current
> - Bank activity statement for the last two (2) months from bank accounts in your name
> - Current rental agreement and/or home mortgage statements including ones outside . . . Alaska
> - Cable bill if applicable
> - Computer internet bill if applicable
> - Phone bill
> - Fishing license/Trapping license/Hunting license
> - State of Alaska driver's license
> - State of Alaska voter's registration card
> - Vehicle registration for all vehicles in your name, including those outside . . . Alaska.

### 2. Ward's Response to the May 13, 2016 Request

Ward provided all of the information requested minus the fishing/trapping/hunting licenses because it appeared that she did not have those. Ward was asked what she believed this letter meant. She testified that she thought it meant that she should provide the State with whatever information it requested to prove that she lived in Alaska.

Ward provided a new COLD application as requested. She testified that the last one she remembered filling out was in 2003. On the application, she provided the names of two witnesses who could verify that she lived in Alaska.

Ward provided a copy of her Alaska Airlines Statement as requested. There are several pages that contain handwritten notes indicating what certain trips were for. Burns did not ask for other airlines in this request, only Alaska Airlines.

Ward provided a copy of unredacted bank statements as requested. While most of the purchases appear to be made in Alaska, several transactions are highlighted. Ward testified that she did not highlight this document. The highlighted transactions are out-of-state purchases. Her Quicken Loan mortgage payment for her Ketchikan home is also highlighted. Ward testified that she and her husband both use this bank account. There are two card numbers in the bank statements . . . .

Ward provided a home mortgage statement as requested for her home in Ketchikan. She did not provide any other current rental agreements or home mortgage statements.

Ward provided several bills and identification as requested. She provided a utility bill from Ketchikan Public Utilities, a bill from Petro Marine Services, three documents showing that she has paid Ketchikan city and borough property taxes, a bill from Quicken Loans confirming that she paid homeowner's insurance and taxes, and a bill from Ketchikan Public Utilities for cable, phone, and internet. All of these bills are for Ward's home in Ketchikan. Ward also provided copies of identification documents, such as her Alaska driver's license, her Alaska voter registration, and her Transportation Worker Identification Credential (TWIC) card.

Ward provided the titles for six vehicles she owned: a 2000 Ford pickup truck, a 2002 Honda motorcycle, a 2002 motor home or fifth wheel,[2] a 2007 Ford Escape, a 1998 Subaru Legacy, and a 2000 Ford Excursion. Burns asked for registrations, but Ward provided titles. Ward testified that she did not realize that a vehicle could be titled in one state and registered in another. She testified that she gathered what she thought Burns wanted. All of the vehicles in her name are registered in Alaska, but Ward testified that her husband recently transferred registration for a few vehicles in 2019.

**3. Burns's Testimony Regarding Ward's First Response**

Burns testified that she received Ward's documents in response to the May 13, 2016 request. Burns requested a new COLD application because they did not have one in paper form on file. While COLD applications are reevaluated annually, the employee does not have to physically fill out a form each year. They cross-reference COLD applications with PFD.

Burns asks for an applicant's bank statements to determine where the applicant spends their money: for example, where they get their hair cut, where they take their dog to the vet, and where they buy groceries. She uses this information to help her determine the applicant's principal place of abode. Burns stated that the majority of purchases were in Ketchikan, but she highlighted areas where she had questions. She highlighted a Quicken Loans mortgage payment and purchases made outside of Alaska.

Burns asked for Alaska Airlines statements to establish when the employee comes in and out of Alaska. She already had access to AMHS's ferry

---

[2] The title says that the vehicle is a 2002 "CONT" — CONT could be a Continental RV. Ward testified that she believed that this title is for the fifth wheel, but she was not 100% sure.

reservation system so she did not need the employee to provide a copy of that. Burns also requests personnel files and time sheets so that she could put together a calendar of the employee's travel. Written notations on the mileage statements were created by Ward, not Burns.

Burns received a variety of bills from Ward. She understood that the Quicken Loan mortgage statement, the utility bills, and the property tax information were for Ward's home in Ketchikan.

Burns explained that she asks for vehicle registrations because a vehicle can be titled in one state and registered in another. Burns did not receive any vehicle registrations from Ward in this submission. Instead, she received several vehicle titles.

### 4. Burns's Conclusions and Next Steps in the Investigation

Exhibit 14 is a copy of the May 13, 2016 letter with notations and a sticky note. Burns testified that she did not make the written notations but that the sticky note was hers. The sticky note reads: "Ward did not provide information about other homes or businesses." The court asked Burns where in the May 13, 2016 letter Ward was asked about businesses. Burns testified that she had not yet asked Ward for this information. Burns only asked for home mortgages in the first request for information; she did not ask for any other kinds of mortgages.

Burns testified that she was aware at this time that Ward had surgery and had been out on extended medical leave in 2015. She knew this from Ward's handwritten notations on the travel documents she provided and from the information in her personnel file. Since COLD and PFD cross-reference information, Burns reached out to PFD but had not received anything yet from their office. She did have access to the PFD database and could see that Ward filed for a PFD for herself and the four Hill children. But, at this time, Burns did not have access to specific details about Ward's PFD status.

When Burns went through the information Ward provided, she testified that she found some inconsistencies. She put together a calendar of Ward's travel and noticed that some travel information was missing. She wanted to clarify these inconsistencies, so she emailed Ward for more information.

### 5. September 27, 2016 Request for Information

On September 27, 2016, Burns sent Ward an email requesting statements from all airlines used for travel, information about a car that was transported from Ketchikan to Bellingham, and specific travel dates for several of Ward's flights. Burns also asked for information about Ward's "home(s) and/or business(es)" outside Alaska. In the email, Burns wrote:

> Also, in the letter you were provided on 5/13/2016, you were asked to provide mortgage/rental statements for those homes within and outside [of] Alaska. You did not include information concerning your home(s) outside [of] Alaska with your response. *Please provide a statement and owner information to your home(s) and or business(s) outside of Alaska.* If you have documentation that you would like to provide now concerning those home(s) and/or business(s) please do so by 10/17/2016.

### 6. Ward's Response to September 27, 2016 Request

On October 12, 2016, Ward faxed and emailed a letter to Burns providing the requested information.

Ward provided travel documentation including her Delta Airlines Statement. Ward testified that she was initially asked to provide Alaska Airlines statements, not other airlines, but she provided the information when asked by Burns.

Ward attached a copy of a recent evaluation done on the property she has in Wyoming. The date of the evaluation was August 15, 2016. Under the customer heading, the address of Daniel Ward, Ward's husband, is listed as 5301 Antelope Valley Street in Gillette, Wyoming. The physical address of the subject property in this

evaluation is 2001 Southern Drive in Gillette. That property is listed as "bare land" and the phrase is both circled and starred. There is a sticky note on the page that reads: "Led to believe it was bare land." Ward did not write the sticky note; Burns did. Ward testified that she and her husband own land in both Alaska and Wyoming. The property referenced in the evaluation is 34 acres of bare land sitting next to a storage unit business they own called Ward Country Storage. Ward testified that Ward Country Storage was not situated on bare land because it has 120 storage units, an office, and a manager's apartment. The address for Ward Country Storage is 5301 Antelope Valley Street in Gillette, Wyoming.

Ward testified that her family's Wyoming property, consisting of the 34 acres of bare land and Ward Country Storage, used to be one parcel. Her husband donated land for them to build a new street called Antelope Valley Street. The storage units, the office, and the manager's apartment are separated from most of the bare land by road. There is also some bare land beside and around Ward Country Storage. The Wards hope to rezone the property and build a housing development.

Ward explained that she was one-quarter owner of Ward Country Storage, a business that generated no income. Ward testified that she is an owner in name only for Ward Country Storage; she is listed as an owner just in case something happens to her husband. She does not handle anything related to the business at all. She testified that all of the income generated by the business goes to pay for the commercial/business loan they took out to build the storage units, the office, and the manager's apartment that sits above the office. Berkshire Hathaway handles the day-to-day operations and management of Ward Country Storage. Ward attached a letter from her Berkshire Hathaway agent. The letter explained that Ward Country Storage Complex LLC has been under Berkshire Hathaway's full property management since June of 2015. The letter stated that the current average monthly income for the business is $2,479.20

without utilities, maintenance, taxes, and insurance. Written on the bottom page is the following inscription: "mortgage payment on this property is $3,150.96 per month."

Ward also provided tax documents for Ward Country Storage. The address for Ward Country Storage on the tax documents is listed as 5301 Antelope Valley Street in Gillette. The tax documents indicate that the storage business is operating at a loss. Ward testified that she was not sure how the business taxes worked because her husband was the one who took care of that.

### 7. Burns's Testimony Regarding Ward's Second Response

On direct examination, Burns discussed what she thought of Ward's second response.

Ward printed out Burns's original email with enough space to handwrite responses. Ward provided answers for each of Burns's questions.

In response to Burns's request for owner information to homes and businesses outside Alaska, Burns stated that Ward circled the word "business" and wrote "[one-quarter] owner no income Ward Country Storage." Burns made note of this response in a sticky note which said: "conflicting [circled] business claims does not have a home and [one-quarter] owner. 50/50 on other docs." Burns testified that she did not remember what other documents she was referring to on the sticky note.[3]

Turning to the property evaluation Ward provided, Burns testified that she believed that Ward wanted to bring her attention to this document; portions were circled and asterisked. Burns believed this document was in response to her question about Ward's homes outside of Alaska. Burns explained that the type of land listed in the evaluation was "bare land." There are several addresses on the page including 5301

---

[3] Ward is half owner of Ward Construction. Burns testified that she was unaware of Ward Construction until the first predetermination meeting. It is unclear when this sticky note was written.

Antelope Valley and 2001 Southern Drive, both of which are in Gillette, Wyoming. Burns testified that Ward did not provide any explanations as to what this document was intended to show.

Burns then turned to the Berkshire Hathaway letter. Burns did not write the handwritten note about the mortgage on this property. Burns understood that this letter was referring to Ward Country Storage . . . . Next, Burns looked at the tax documents provided. Two addresses are asterisked and the line containing the ending capital balance is circled. Burns believed that Ward provided this document to show that Ward Country storage was operating at a loss and that she received no income from it.

### 8. Burns's Conclusions and Next Steps in the Investigation

After reviewing Ward's second submission, Burns testified that she still had more questions that needed to be answered before she could make a final determination about whether Ward was eligible for COLD benefits. Burns was concerned that Ward's businesses were located out of state. She also believed that Ward had an undisclosed home in Wyoming. She explained that she did a Google maps search of Ward Country Storage. In the image generated, there were three long rectangle buildings that were storage units. But there was also another structure on the property. Burns believed that this structure was a home. There was a fifth wheel parked next to the structure. Burns had no information about the structure at that time. The court asked how Burns could tell that the structure was a home simply by looking at it. Burns said that she could not tell for sure that it was a home, but she wanted to ask Ward about it.

Back in April and May of 2016, prior to the first request for information, Burns had already looked at CourtView and saw that Ward had custody of her four grandchildren, the Hill children. Burns also saw where Ward had requested to relocate the Hill children to Gillette, Wyoming. Burns could not see the entire document on

CourtView, only a brief summary. The address on CourtView matched the address for Ward Country Storage where this other unidentified structure was located. Burns further explained that the property evaluation provided by Ward indicated that the property was bare land, yet it appeared that there was a dwelling or a home there. She had questions about this structure and wanted answers.

Burns testified that she looked online and found some documents regarding Ward Country Storage. Burns found that there was an application for a certificate of reinstatement for Ward Country Storage. The filing date on the certificate of reinstatement is July 8, 2016, right after Ward received the first request for information. Burns also found the articles of incorporation for Ward Country Storage. In the articles of incorporation, the management was listed as Daniel Ward, Debby Ward, Bill Ward, and Irene Ward. When Burns made her second request for information in late September of 2016, asking for a statement and owner information for Ward's businesses, Ward provided some documents, but she did not provide these particular documents.

Burns then discussed some pictures she found online of the unidentified structure and fifth wheel located next to Ward Country Storage. Based on the information she had available, Burns believed that the structure was a home that Ward had not previously disclosed. Burns used a snipping tool online that allows her to take images from the internet, crop them, and email them to herself. Underneath the first picture is a sticky note that Burns wrote: "discovered 'house' and trailer on property [Ward] had not mentioned." Burns then turned to the two documents labeled "Parcel Details." Burns circled the owners and owners' address, which included both Bill Ward and Daniel Ward, at 19203 N.E. Dawn Drive in Yacolt, Washington.

Burns also received information from PFD. She received documentation showing that Ward's four grandchildren were not registered for school in Alaska; they were registered for school in Gillette, Wyoming as of August 26, 2015. Burns believed

that this substantiated her concerns about Ward relocating to Gillette since her four grandchildren were there. Burns's overall impressions were that the grandchildren were located in Gillette. She questioned whether the structure on the property in Wyoming was a home and whether the grandchildren lived there.

After examining all of the information Ward provided in her second response and the information gathered from outside sources, Burns still had questions. Burns began speaking with [Ward's AMHS manager] about next steps in the investigation. The manager wanted to move forward with the investigation, which is common when dishonesty is alleged. A letter was drafted and sent to Ward informing her that a predetermination hearing was required.

### 9. February 1, 2017: The First Predetermination Hearing

On February 1, 2017, the first predetermination hearing in Ward's case was held. At this meeting, Ward was questioned about her principal place of abode. Burns asked Ward what she believed principal place of abode meant. Ward responded that principal place of abode is where she lives, owns a home, pays utilities, and collects mail. Ward explained that her physical address and mailing address were both in Ketchikan. Burns asked Ward whether she intended to stay in Alaska or whether she was going to join her family in Wyoming. Ward said that Alaska was her home and that she was staying here; she just needed to get the situation with her grandkids figured out.

Burns asked Ward why she did not tell Human Resources or PFD that she owned a home in Wyoming. Ward stated that she does not own a home in Wyoming. Ward explained that there is a structure on the property that was built as an office for the business, Ward Country Storage. Above the business office, there is a small studio apartment, a manager's apartment that anyone in the Ward family could live in if they wanted. Ward did not consider the apartment to be a "home" since it was associated with the business, built with a business loan, and Ward herself did not live there.

Burns replied saying that she "would not call that an apartment" as it was a stand-alone building with multiple bedrooms and garage doors. Ward replied explaining that they are in the process of adding some bedrooms onto the upstairs apartment to make it a larger space, but that the downstairs is an office for their business. Additionally, Ward says that there are two extra storage containers on each side of the office; they are not garages as Burns alleged. Burns asked Ward if she was able to provide the State with something that demonstrates that the stand-alone building was an office/apartment and not a home. Ward replied saying that she submitted paperwork showing that the building was for their business; it was office space. Burns asked who stayed in her Ketchikan home while she was gone. Ward explained that different people came and checked on her house while she was gone but that she was not renting it out to anyone.

Ward was also questioned about her business(es) in Wyoming. Ward explained that she is a part owner of Ward Country Storage but that she is otherwise unassociated with the business. It is her husband's family business and she is essentially owner in name only. Additionally, Ward said that the day-to-day operations are handled through Berkshire Hathaway. Prior to Berkshire Hathaway managing the business, Ward's granddaughter was managing operations there. Burns asked about Ward Construction LLC. Ward explained that the construction company was her husband's. Ward Construction was licensed in both Alaska and Wyoming at varying times depending on where her husband was taking jobs.

Burns asked Ward about her custody case with her four grandchildren. Ward explained the Hill children's living situation from the time they moved to Wyoming to current. Burns asked if Ward had a special agreement to allow the grandkids to live with someone else other than herself. Ward said no and that she did not realize she needed one as she and her husband both had primary physical and legal custody of the Hill children. Ward explained that her intention was that she would no

longer be caring for the Hill children once they were moved to Wyoming. Ward provided for them financially, but was not living there with them. Between her husband and his family, the Hill children would be looked after until they were reunited with their mother. Ward wanted the Hill children to transition in the new location so that reuniting with their mother would be easier when she got out of jail.

Burns asked about Ward's numerous vehicle registrations. Ward has a fifth wheel that was registered in Alaska at one point, but is not currently registered as it is parked on the property in Wyoming. Ward has two four-wheelers that her husband took to Wyoming. They also have a car in Bellingham that is being serviced. They planned to give that car to their daughter. There is also a pickup truck that was taken from Alaska to Wyoming — they are trying to sell it. Ward said that she would look for vehicle registrations.

Burns then made her conclusory remarks. Burns believed that there were inconsistencies in the information provided by Ward and that a second predetermination meeting would be needed. Burns explained that a primary home, or principal place of abode, is usually where family is and where you go when you are not on vacation or at work. Burns concluded that the manager's apartment in Wyoming was a "home." Burns said that it looked like Ward was misleading with the information she provided because the apartment in Wyoming was not initially disclosed. It appeared to Burns that Ward was coming to Alaska to work and then returning home to her family in Wyoming, which would render her ineligible for COLD benefits. Burns found it difficult to believe that Ward had custody of her four grandkids but was not physically there to take care of them.

### 10. Burns's Testimony Regarding the First Predetermination Hearing

Burns testified that the focus of the first predetermination hearing was not really about COLD benefits anymore, but whether Ward intentionally provided

misleading information. Ward explained that the dwelling was an office/apartment, not a home. There was disagreement of terminology, but Burns felt that a place where people live is a home, regardless of whether it was a single-family home, a condo, an apartment, or some other dwelling. Burns did not receive any utility bills for the structure in Wyoming. Burns had also not received all of the registrations for vehicles in Ward's name. Burns learned that the fifth wheel and a few other vehicles were in Wyoming. Burns testified that Ward expressed confusion between vehicle titles and registrations but that Ward tried to explain where each of her vehicles was located.

Burns also learned of Ward Construction for the first time in this meeting. Ward stated that she did not know much about the businesses because her husband handled them; she was owner in name only. Burns seemed to accept that Ward knew minimal things about the business, such as who managed it, but did not handle the day-to-day affairs or tax information.

After the first predetermination meeting, Burns testified that she met with Ward's AMHS manager and discussed what was said in the meeting. Ward said that she would provide more information to clarify some of the issues they pointed out in the meeting. Burns testified that she decided to hold off making a final determination until after that information was received.

### 11.    Burns's February 8, 2017 Follow-up Email

In a follow-up email, Burns specifically requested the following information from Ward:

- Tax records
- Documentation of when the office/apartment was converted adding 4 bedrooms (permit to build, etc.)
- Documentation of the dwelling being approved and finalized, which you stated just happen[ed] recently
- You also stated that you and your husband own a construction company which provides services

outside of Alaska. Can you please provide a copy of the applicable business license[.]

**12. Ward's Response to February 1, 2017 Predetermination Hearing and February 8, 2017 Follow-up Email**

After the first predetermination hearing, Ward submitted further documentation. In an email, Ward explained the situation with the manager's apartment. It is a business office for Ward Country Storage on the bottom floor. The top floor was once a studio apartment that the manager lived in, but it has recently been renovated into a four-bedroom, two-and-a-half-bathroom apartment with a family area and a kitchen. It currently has several members of the Ward family living in it including the Hill children. Ward explained that her husband asked the city to rezone the property so that they can subdivide and build a housing development there. But this process could take several years to complete.

Attached to this email, Ward provided many documents that the State requested in the February predetermination hearing: the certificate of registration for Ward Construction LLC, a certificate of occupancy for Ward Country Storage, a picture showing the plot of land where the storage units are, a building permit to build the apartment above the office issued in 2011, another certificate of occupancy regarding the addition to the apartment in 2016, the building permit for the add-on issued in May of 2015, 2015 taxes for Ward Country Storage, a summary of a bank account for Ward Construction, Ward's 2016 tax information, several pictures of the manager's apartment, an invoice from Petro Marine Services, and several letters from people who vouched for Ward living in Ketchikan.

Ward testified that there were some miscommunications about the office apartment in the first predetermination hearing. She explained her family's living situation in Wyoming to the best of her recollection in the email she sent to Burns. She wrote that the office apartment "is a family owned property and business, not a personal

home to any one person." There are highlights and sticky notes on the email that Ward sent, but Ward did not make them. The address listed on the personal tax documents, bank statements, and utility bills are Ward's address in Ketchikan. Ward testified that she circled the addresses to prove that she lived in Ketchikan. Ward discussed her choice in completing physical therapy in the lower 48. She explained that she chose to stay in the lower 48 for physical therapy because she had more family members there who could help her.

### 13. Burns's Response, Conclusion, and Next Steps in the Investigation

Burns received Ward's documents, went through them, and made sticky notes or highlights for things she still had questions about. Burns did not question that Ward had a home in Ketchikan. However, after looking at the pictures provided of the office space and manager's apartment, Burns testified that it solidified her opinion that the apartment in Wyoming was also a "home." At this point, Burns was aware that Ward was a part owner of Ward Country Storage and Ward Construction. Burns also knew that there was a mortgage for the office/apartment for Ward Country Storage.

Burns then discussed Ward's 2015 motion to relocate the Hill children to Gillette. Burns received a full copy of the 2015 motion to relocate after the first predetermination hearing. Ward and Burns argued in the first predetermination hearing about whether the apartment was a home, as opposed to a manager's apartment or office space. However, in Ward's motion to relocate, Ward wrote that "we own property and a home in Gillette, WY where my husband is developing land. I would like permission to move and relocate before the '15-'16 school year starts . . . ." This document was signed on June 22, 2015, long before the COLD investigation began. Burns testified that the court document solidified her view that Ward had a home in Wyoming and that Ward relocated there to live with and take care of the grandchildren.

Burns did some research online and found several documents. Ward previously provided a document showing that Ward Construction was licensed in Alaska. The documents Burns found online showed that Ward Construction was dissolved in 2016 in Alaska. She wanted to ask Ward follow-up questions about this. Burns also found documents pertaining to Ward Country Storage in Wyoming.

Burns also pulled Ward's DMV records regarding vehicles. Burns made notations and highlights on the documents. Burns noted when Ward provided vehicle titles. Exhibits [included] detailed reports of vehicles that had a lien holder in Wyoming. Burns thought that was worth noting.

Burns explained that after looking at all of the information she had available, a second predetermination hearing was needed. She sent Ward a letter letting her know the date and time of the second predetermination meeting.

On July 19, 2017, just a few days before the second predetermination hearing, Burns learned that Ward's home in Ketchikan was up for sale. She printed out some of the information from the listing she found online . . . . She picked out specific photos showing empty rooms in the house and printed them out. Burns was concerned that Ward's home appeared to be "vacant."

**14.    July 24, 2017:  The Second Predetermination Hearing**

On July 24, 2017, the second predetermination hearing was held. Tempers and tensions were high in this meeting. The parties talked about the differences between residency and principal place of abode for quite some time, especially towards the end of the meeting. There was a lot of confusion; residency and principal place of abode seem to be similar in nature, but the differences were not well articulated by any party. Burns stated that all of the items Ward provided do not support her claim that her principal place of abode is Alaska. Ward and her union representative asked Burns what other information she needed to provide to prove that her principal place of abode

was Alaska.  Burns deflected, telling them that it was incumbent upon the employee to provide information to support their claims, but in her opinion, "the matter is at rest."

The union representative asked Burns whether Ward had provided the State with the information it requested, and if not, what information was lacking.  The union representative also asked Burns what documentation the employer would need to see to prove that Ward's principal place of abode was in Alaska.  Burns said that she did not need anything else at this point.  Burns invited Ward to provide more information that she felt would bolster her claim.  If they chose to submit more information, Burns asked them to focus on primary place of abode, not residency.  Ward expressed frustration, saying "Oh my God, what's the difference?"

The union representative asked Burns to explain the difference between residency and principal place of abode.  Burns said that principal place of abode is where the employee lives, where their belongings are, where they spend their time, where their family is, and where their cars are.  The union representative interjected, saying that where one's family lives has nothing to do with an employee's principal place of abode.  Burns disagreed, saying that family is "very important to determining principal place of abode."  Burns told the union representative to "look it up."  The union representative asked on what grounds the State bases principal place of abode; he asked for a statute or regulation.  Burns said that there was no statute or regulation.  The Collective Bargaining Agreement references principal place of abode but does not define it.  Burns stated that residency and principal place of abode were different standards, but did not explain exactly what documentation was required to prove the location of one's principal place of abode.

Burns asked Ward what she believed principal place of abode meant.  Ward said that it is where she lives, where her belongings are, and where she goes when she is not at work.  Ward expressed frustration with the increasingly amorphous definition of principal place of abode.  She asked Burns what principal place of abode

meant. Burns deflected, saying "I'm asking you what [principal place of abode] means to you." Ward explained that she did not really understand what it was. Ward said that she has traveled quite a bit in the last few years for various reasons but that Ketchikan is her home. Ward stated that she owns and maintains a home in Alaska, has voter registration and a driver's license in Alaska, pays a home mortgage in Alaska, has ties to the community and family in Alaska, has been an Alaska resident for 15 years, and owns property on Prince of Wales and in Saxman.

Burns asked that if Alaska is Ward's principal place of abode, why was her house in Ketchikan for sale. Ward said that she did not need such a large house for herself and was looking to downsize. Ward said that she was looking to purchase a mobile home. Since the Hill children were relocated to Wyoming to be reunited with their mother, Ward explained that she had no need for a three to four bedroom house. Burns asked Ward where all of her belongings are since her home in Ketchikan is "completely vacant." The union representative asked what that had to do with Ward's residency and Burns said that she did not think it was irrelevant to determine principal place of abode. She explained that where one's belongings are located is important for that determination. Burns indicated that the listing online showed a vacant house. Ward said that was not true. The upstairs of the house was recently remodeled, but her belongings were downstairs and in the garage.[4]

Burns asked Ward why the manager's apartment in Wyoming was not a "home." Ward explained that it is an apartment above the office for the storage unit

---

[4] On cross-examination, defense counsel pointed out that Burns intentionally left out pictures from the online listing that showed occupied spaces in Ward's home. Burns testified that she misspoke: she said the house was vacant and Ward corrected her. Additionally, both Ward and her real estate agent testified that the upstairs was empty for remodeling but that Ward's belongings were downstairs and in the garage. Ward's home in Ketchikan was not vacant.

business.  It was family-owned and available for anyone in the family to use.  She explained that the apartment was not her home and she did not live in it; her adult family members, adult children, and some of her grandchildren live there.  Burns asked if Ward had any mortgages in Wyoming.  Ward explained that there was a business loan for Ward Country Storage that she, her husband, and her husband's family took out.  The business office and manager's apartment were built with a business loan, not a home loan.  As such, Ward does not have a home mortgage or current rental agreement for the manager's apartment; in her mind, it is not a "home" since it is associated with the business.

In terms of businesses, Burns asked why Ward failed to disclose her interest in her husband's business, Ward Construction.  Ward explained that she owned a construction company with her husband.  Her husband manages the business, she does not.  She also explained that she believed that the construction and storage unit businesses are departments of the same company; not two separate companies.[5]  In her mind, Ward provided documentation about the businesses when Burns asked about them.  Ward stated that she was not trying to hide anything or be misleading; she thought that she had provided the requested information in previous submissions or conversations.  When asked about income from the business, Ward indicated that the business is operating at a loss.  Ward questioned what her husband's businesses had to do with her residency in Alaska.

Burns asked about Ward's custody arrangement with the Hill children. There is a 2015 court document where Ward petitioned the court to relocate the grandkids.  That document reads:

---

[5]      Ward was incorrect about this.  Ward Construction and Ward Country Storage are two separate businesses.  It appears that Ward did not understand the business structure.  This is consistent with her repeated testimony that she is owner in name only and has nothing to do with the businesses.

> I, Debby Ward, request that: I be granted permission to vacation outside of Ketchikan with all 4 children . . . during the month of July 2015. *Also, want to move and relocate to Gillette Wyoming starting August 13, 2015.* I want to take the children on vacation to Anchorage as well as Southern California in July. *Also, we own property and a home in Gillette, WY* where my husband is developing land. The youngest is starting pre-school and the oldest is starting Jr High School. *I would like permission to move and relocate before the '15-'16 school year starts.* The children's mom will be relocated to Gillette, WY in the fall of 2016.

After reading this document aloud, Ward explained that there was a typographical error in the document. The State believed that when Ward said "I would like permission to move and relocate before the '15-'16 school year starts," that meant that Ward, herself, would be relocating to Gillette, Wyoming with the grandkids. Ward said that was not the case. When she said "want to move and relocate to Gillette," Ward clarified that she meant the grandkids, not herself. Ward intended to drop the grandkids off in Wyoming with her husband and his family so they could be reunited with their mother when she got out of jail. Then, Ward would return to Alaska and continue living and working with AMHS.

Ward was asked about her vehicles. She said that she had a Ford Escape that she was driving. Her husband recently brought his F-250 truck on the ferry from Bellingham, Washington. There was another Ford pickup truck in Bellingham that the crew uses, one broken-down Subaru at her daughter's house in Ketchikan, and another working Subaru in Ketchikan. Burns asked Ward why she provided the title of a broken-down Subaru when its registration expired in 2014. Ward said that Burns asked for registrations or titles to all vehicles in her name, so she provided it as requested. Ward indicated that she did not know exactly how many vehicles she had anymore, whether 12 or 20. She said that she never tried to hide a vehicle, she simply had too many to keep track of. Some were broken down, some were running, some were in

storage, and some were being used by other family members. Ward gave Burns the title to every vehicle she could think of.

Burns asked about a lien on a Honda Motorcycle. Ward said that the motorcycle was her husband's and that it had been parked for a long time. She did not know anything about a lien on the motorcycle. Burns asked whether Ward knew what loans had been taken out in her own name. Ward replied that her husband had power of attorney and that she did not know about any lien or loan on the motorcycle. There was a second lien taken out on another vehicle in Ward's name. Both loans were taken from a bank in Wyoming. Burns asked Ward why she used a Wyoming bank as opposed to a local, Alaskan bank to take out the loan. The union representative asked Burns what that had to do with establishing Ward's residency in Alaska. He explained that you can get a loan on the internet and that had little to do with where someone lived. Burns replied that it was important in determining principal place of abode. Burns stated that people usually take out loans in or near their principal place of abode. Ward said that she did not know anything about a lien or loan and that her husband must have done that.

Burns asked if the businesses had any equipment that they used. Ward said that she was not sure but that her husband had a truck, a skid steer, and approximately three containers of hand tools. Burns asked why Ward did not provide registrations for her vehicles located outside of Alaska. Ward said that she did not believe a skid steer had to be registered like a regular vehicle. Burns asked if Ward had any vehicles registered out of state, including vehicles used in her husband's construction business. Ward said that she was not aware of any vehicles registered outside Alaska and she questioned what her husband's work equipment for his job had to do with her residency in Alaska.

Burns asked if there was anything else Ward wanted to say. Ward said that she did not know what Burns wanted to hear. Ward said that she lives in Ketchikan.

She pays a mortgage for her home on Fourth Avenue.  She pays cable, internet, heat, utilities, property taxes, and all other bills associated with her Ketchikan home.  Burns interjected and asked, "but what is your principal place of abode?  Where do you go on your two weeks off?"  Ward had a two week on two week off schedule with AMHS at the time.  Ward explained that it depends.  Sometimes she stays in Ketchikan while she is on break.  Sometimes she travels to see her family in Wyoming, Colorado, and South Dakota.  Burns explained that she built a calendar of Ward's travel and that most of her off-time in 2015-2016 was spent in Wyoming.  Ward explained that she had a double knee replacement surgery in late 2015 and spent several months in Wyoming doing surgery, rehab, and physical therapy . . . .

### 15. Ward's Testimony Regarding the Second Predetermination Hearing

At trial, Ward explained what documents she submitted after the second predetermination hearing.  She submitted her full tax filings for 2015, a power of attorney form, and a four-page handwritten letter.  In the letter, Ward recounted where her vehicles were located and explained that, while she could not find all of the titles, she made efforts to provide what the State asked for.  She also argued that her full, unredacted tax information was really none of the State's business, but she provided it anyway when asked.  Ward testified that her husband does all of the taxes and that he has power of attorney over her.  The address from her taxes was her address in Ketchikan.  Ward testified that the only home mortgage she has is for her Ketchikan home.  Speaking of her Ketchikan home, Ward said that there were many pictures in the listing that did not make it into Burns's packet; Burns's packet was purposefully incomplete.

### 16. Burns's Testimony Regarding the Second Predetermination Hearing

After the second predetermination meeting was over, Burns testified that she debriefed with some others and decided to give Ward time to submit further documentation.[6] After receiving the documents, Burns met with [three other AMHS staff members]. They provided a synopsis and recommendations to the administration so that they could determine what level of discipline was warranted. They provided a report to Human Resources and Labor Relations. They collectively decided to dismiss Ward. Burns helped draft the termination letter.

### 17. August 21, 2017 Termination

On August 21, 2017, Ward was fired from AMHS for dishonesty. The letter explained that Ward was deceptive throughout the investigation into her COLD eligibility. AMHS believed that Ward was dishonest about where her principal place of abode was for 2015-2016. The letter focused on Ward's failure to disclose that she had businesses, a home, several vehicles, and most of her family (including the Hill children of whom she had custody) out of the State. AMHS said that Ward was evasive and not forthright, that she provided misleading information resulting in a monetary benefit, was intentionally deceptive, and those were the reasons that she was being fired. Ward also received a separate letter regarding COLD overpayment calculations. This letter states that Ward "received the COLD payments without a valid claim to residency" and that she would have to pay back what she was overpaid.

. . . .

---

[6] Burns's trial testimony, that she had not made a decision yet, conflicts with her testimony in the second predetermination hearing where she said that she did not need any more documentation and "in my opinion the matter is at rest."

## LAW AND ANALYSIS

. . . .

**B.      Principal place of abode is an arbitrary standard.**

Whether principal place of abode is an arbitrary standard has some relevance to the just cause determination, but does not appear to be determinative. A just cause discharge is one which is not for any arbitrary reason. Just because the standard is arbitrary does not necessarily mean that the employer fired the employee for an arbitrary reason. But it seems that the two are connected in this case. Ward provided a lot of documentation to prove that Alaska was her primary place of abode, but due to the arbitrary standard the employer used to evaluate this claim, the employer came to the conclusion that her principal place of abode was somewhere else despite the bulk of contrary evidence.

There is nothing defining the term "principal place of abode" as it relates to COLD in the Collective Bargaining Agreement, state statute, or state regulation. This makes the standard arbitrary, as it leaves the definition and the requirements needed to prove principal place of abode up to the individual or agency conducting the COLD investigation. There do not appear to be any objective, transparent requirements for meeting this standard.

In the termination letter, AMHS explained its view of the evidence and how it relates to Ward's principal place of abode. The letter states:

> Based on the preponderance of the evidence, it is reasonable for the Employer to conclude that since at least 2015 your primary place of abode has been outside [of] Alaska, making you ineligible for COLD payments.

The purpose of the COLD investigation was initially to determine whether Alaska was still Ward's principal place of abode. But what does principal place of abode mean? Rule 17.01 in the Collective Bargaining Agreement states the following:

This agreement includes a pay plan providing a cost-of-living differential between employees living in the State and those living outside the *State in accordance with AS 23.40.210*. Cost-of-living differential (COLD) payments are a geographical differential which reflects the difference in the cost of living in Alaska and Seattle, Washington. An employee establishes eligibility for COLD payments *by establishing and maintaining their principal place of abode within the State* [*of Alaska*].

Alaska Statute 23.40.210(b) states that "an employee is eligible for the cost-of-living differential under (a) of this section only if the individual is *a state resident*." Alaska Statute 23.40.210(e) states: "In this section, 'state resident' means an individual who is physically present in the state with the intent to remain permanently in the state under the requirements of AS 01.10.055 . . . ."[7] It would appear from Rule 17 of the Collective Bargaining Agreement and the above referenced statutes

---

[7] Alaska Statute 01.10.055 explains the requirements to obtain Alaska residency:

(a) A person establishes residency in the state by being physically present in the state with the intent to remain in the state indefinitely and to make a home in the state.

(b) A person demonstrates the intent required under (a) of this section

(1) By maintaining a principal place of abode in the state for at least 30 days or for a longer period if a longer period is required by law or regulation; and

(2) By providing other proof of intent as may be required by law or regulation, which may include proof that the person is not claiming residency outside the state or obtaining benefits under a claim of residency outside the state.

that eligibility for COLD depends, at least in part, on whether one is an Alaska resident. If so, where does "principal place of abode" come into play?

A recurring question and point of heated contention between the parties was trying to determine what principal place of abode means, how or if it differs from residency, and what documentation an employee would need to provide the employer to prove their principal place of abode. The shifting goalpost of what constitutes principal place of abode can be seen throughout Ward's COLD investigation. In the May 2016 letter, Burns asked for information that would be relevant to determining Ward's state residency: where she currently lives, where she travels, where she pays bills and utilities, where she spends her money, and where she claims residency. In the September 2016 email, Burns asks about travel information and Ward's out-of-state homes and businesses.

So far, the aim of the COLD investigation seems to be whether Ward has established residency in Alaska. Yet, in the first predetermination hearing, Burns said that principal place of abode is usually where the family and/or spouse lives and where the employee goes when not at work or on vacation. In the second predetermination hearing, Burns defined principal place of abode again, but with different criteria. Burns said that principal place of abode is where one lives, where their belongings are, where they spend their time, where their family is, and where their cars are. Burns said that where the employee's family and spouse live is very important for determining the employee's principal place of abode. Ward's union representative argued that where an employee's family lived was not important; COLD was based on the employee's principal place of abode, not that of the family or spouse. Burns said that where the family lived was important and that he should "look it up." The union representative

immediately asked for a statute or regulation defining principal place of abode, but Burns said that there were none.[8]

During and after the first predetermination hearing, Burns placed a lot of emphasis on where an employee's family was located in determining that employee's principal place of abode. But if the location of the family and spouse is such an important criterion for determining principal place of abode, why was Ward not asked to provide family information in the May 13, 2016 letter? Why was Ward not asked to provide family information in the September 2016 email? Ward was not asked about family until the first predetermination hearing, which makes it seem like the location of the family is not as important for determining principal place of abode as Burns made it out to be. Burns was asked where she was getting the family and spouse location criterion she used to determine principal place of abode, and she specifically referenced [an] arbitration decision. However, Burns seemed to agree that the Collective Bargaining Agreement lacks a provision saying that the Union must use [that] arbitration decision, or any arbitration decision for that matter, as binding precedent for future disputes.

At trial, Burns discussed principal place of abode further. On direct examination, Burns explained that the Collective Bargaining Agreement between the State and the Union references principal place of abode but does not provide a definition. When asked to define principal place of abode, Burns testified that there is no agreed-upon definition. She stated that an employee's principal place of abode is generally the "home of first importance." She bases that definition not on statute or regulation but instead on the Collective Bargaining Agreement's provisions and prior arbitration decisions. Burns was asked where the prior arbitration decisions she

---

[8] How could the union representative "look it up" when it is not written anywhere?

mentioned could be found; they are housed in the Department of Administration's Division of Personnel and Labor Relations and also with the Union. It is unclear whether these arbitration decisions are available to the general public or to State employees.

Burns was asked what makes a home "primary" or "principal" for COLD purposes. She said that many employees have multiple homes in and out of Alaska. To determine which is their primary home, or the home of first importance, Burns testified that she looks to see where the employee's family and spouse are located. But what if the employee lives in a different location than the family and spouse? It is not uncommon for such arrangements to take place in our modern society. Burns agreed with defense counsel that such extenuating circumstances can exist and that was what the COLD investigation was about.

Burns was asked whether Ward having knee replacement surgery and subsequent physical therapy out of state would change her principal place of abode. Burns said not necessarily, because surgery and physical therapy are temporary conditions that last less than one year. This indicates that the principal place of abode standard has exceptions and/or allowances, but where can an objective list of those be found? Despite Burns's testimony on Ward's medical absences, AMHS determined that Alaska was no longer Ward's principal place of abode partially because of her extended absence in Wyoming at the end of 2015.

Burns testified that determining principal place of abode for COLD benefits is not the same as determining residency for PFD; they are separate and distinct inquiries with different criteria. Yet, in the termination letter, AMHS partially based its determination that Alaska was not Ward's principal place of abode on the fact that the Department of Revenue found that she did not meet the residency requirements to

receive a PFD that year.[9]  But if principal place of abode has different criteria than residency, why would AMHS base part of its decision on a separate and unrelated PFD determination?  The differences between residency and principal place of abode are as clear as mud.

Without objective, transparent criteria, it appears that the principal place of abode standard is arbitrary; left up to the individual conducting the investigation.  There can be no standard, objective, or uniform application of this standard when the standard itself is a nebulous, abstract concept.  But, as stated earlier, just because the standard is arbitrary does not necessarily mean that the employer fired the employee for an arbitrary reason.

## C.    Just Cause

A discharge for just cause is one which is not for any arbitrary, capricious, or illegal reason and which is based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true.[10]  This approach checks the subjective good faith of the employer with an objective reasonable belief standard.[11]

---

[9]    Ward had a separate PFD investigation going on around the same time as the COLD investigation.  Ward submitted paperwork for a PFD for herself and the Hill children.  However, Ward did not tell PFD that she had been out of State for more than 90 days.  Going to the lower 48 for medical treatment is an allowable absence, but Ward did not tell PFD that she was gone.  Ward got into some trouble for the children's PFDs as well.  Ward marked the box on the application that says that the children were in-state when the PFD was filed.  That was not true.  Since PFD and COLD cross-reference, this information was available in Ward's COLD investigation.  The Department of Revenue did not pursue criminal charges but found Ward ineligible for PFD.

[10]    *Braun v. Alaska Com. Fishing & Agric. Bank*, 816 P.2d 140, 142 (Alaska 1991); *Cassel v. State, Dep't of Admin.*, 14 P.3d 278, 284 (Alaska 2000); *Manning v. Alaska R.R. Corp.*, 853 P.2d 1120, 1125 (Alaska 1993).

[11]    *Cassel*, 14 P.3d at 284.

Whether an employee was terminated for just cause or for an illegitimate reason is a question of fact which we review for substantial evidence.[12] Substantial evidence exists when, in light of the whole record, reasonable minds might accept the administrative agency's decision.[13] It is a legal question whether the quantum of evidence is substantial.[14]

Under the Collective Bargaining Agreement, dishonesty is grounds for immediate discharge. Black's Law Dictionary defines arbitrary as: "Depending on individual discretion; of, relating to, or involving a determination made without consideration of or regard for facts, circumstances, fixed rules, or procedures. (Of a judicial decision) founded on prejudice or preference rather than on reason or fact."

AMHS terminated Ward because it believed that she was dishonest in the information she provided, or failed to provide, during the COLD investigation. In the termination letter, AMHS explained its view of the evidence [supporting] its decision to terminate Ward's employment. AMHS believed that Ward was evasive, deceptive, and not forthright for:

- failing to initially disclose her "home" in Wyoming
- failing to disclose both of her businesses after being asked to provide business information
- failing to provide vehicle registrations for the 20+ vehicles in her name
- characterizing her property in Wyoming as "bare land"
- arguing that Wyoming was not her principal place of abode when she signed a court document in 2015 expressing her intention to relocate her grandchildren to their home in Wyoming
- claiming that Ketchikan was her home, but her house was up for sale

---

[12] *Id.* at 282.

[13] *Id.*

[14] *Id.*

AMHS also took into consideration the fact that Ward did not receive a PFD because the Department of Revenue concluded that she did not meet residency requirements. Each of these proffered reasons will be evaluated below. The first three sections are interrelated, as they have to do with Ward's homes and her principal place of abode.

> **1. Whether there is substantial evidence to support AMHS's conclusion that Ward was evasive, deceptive, and not forthright when she failed to initially disclose her "home" in Wyoming, and whether that conclusion was based on AMHS's reasonable belief.**

Much of the confusion and contention between the parties is centered over whether the apartment in Wyoming is a "home." While it is true that various members of Ward's family have lived there, it was built as part of their business. As explained in the predetermination hearings, when the Wards originally built the office, they chose to simultaneously build a small apartment above the office so that the business manager would have a place to live. Before Berkshire Hathaway took over management of Ward Country Storage in 2015, Ward's granddaughter managed the business and lived in that apartment.

AMHS did not ask Ward for a list of all her "homes." The May 2016 letter specifically asked for Ward's current rental agreements and/or Ward's home mortgage statements. Ward provided the home mortgage statement for her Ketchikan home. Burns did not ask Ward to provide information about where her spouse and/or other family members lived. In the September 2016 email, Burns asks Ward for "a statement and owner information to *your* home(s) and business(es) outside of Alaska." This request is prefaced with a reminder that Ward was asked for her "[home] mortgage/rental statements" in the May 2016 letter. Ward already provided her home mortgage for the Ketchikan home. She did not provide any of her other current rental agreements or home mortgage statements in the September request as it appeared that

she did not have any. Ward also provided information about the business mortgage for Ward Country Storage.

Burns testified that when she received Ward's second response, she believed that Ward failed to disclose a home in Wyoming. She looked up Ward Country Storage on Google Maps and saw another structure on the property that was unknown. Burns believed this was an undisclosed home. Burns asked Ward about the unknown structure in the first predetermination hearing. Ward told Burns that the structure was not a home; the bottom floor was an office space for the storage unit business and the top floor was a small apartment that has been expanded over time. The structure was built as a part of their business. After the first predetermination hearing, Burns received Ward's 2015 motion to relocate. In this court document, Ward asks the court for permission to relocate the grandchildren to their "home" in Wyoming. This solidified Burns's view that the apartment was a home and Ward relocated there with her grandchildren in 2015.

In the second predetermination hearing, Burns asked Ward why the apartment in Wyoming was not a home. Ward was adamant that the apartment was not a home as it was built as part of their business. Ward also explained that it was not her home; she did not live there. Ward was also asked to explain the 2015 motion to relocate. Ward explained that there was a typographical error; she was asking for permission to relocate her grandchildren, not herself. The Hill children's mother was scheduled to get out of jail in a few months, and Ward wanted them to have a fresh start in a new location. The Hill children would have to change schools, which can be difficult. Ward wanted to make the transition easier on them by having them start the new school year at the new school.

The State brought up the fact that Ward referred to a "home" in Wyoming in the 2015 Motion to Relocate. Some might reasonably consider the manager's apartment a "home" in colloquial terms. However, in terms of the COLD investigation,

Ward was asked for her current rental agreements and/or *her* home mortgages in the May and September 2016 requests for information. Ward does not have a current rental agreement or home mortgage statement for the Wyoming apartment. Ward does not live in that apartment. Ward does not rent that apartment. There is no home mortgage for that apartment because it was built with a business loan as opposed to a home loan. Thus, despite having an apartment on the top floor, the overall structure is a business space.

When asked about businesses in the September 2016 email, Ward provided the business mortgage for Ward Country Storage, which includes the office and manager's apartment. As such, it appears that Ward provided exactly what Burns asked for in responses to the May and September 2016 requests for information. Ward also provided consistent testimony about the apartment at both predetermination hearings, pictures of the structure, tax information, building permits, certificates of occupancy, and other documentation to support her claim that the structure is part of their business; an office on the bottom floor and a manager's apartment on the top floor. Even after receiving all of this information and a written explanation from Ward, Burns was still convinced that the apartment was a "home" and that Ward was evasive, deceptive, or not forthright for failing to disclose that information in her responses to the May and September requests for information. This conclusion is not supported by substantial evidence or reasonable belief.

    **2.    Whether there is substantial evidence to support AMHS's conclusion that the Wyoming "home" was Ward's principal place of abode in 2015 and whether that conclusion was based on AMHS's reasonable belief.**

Ward has contended from the beginning of the COLD investigation that her home is in Ketchikan. She has provided a lot of documentation to support that. Throughout the COLD investigation, Ward provided documents to show that 2308 Fourth Avenue in Ketchikan was her home, her principal place of abode:

- Motion to Relocate
- May 13, 2016 Letter
- 2016 COLD Application
- Alaska Voter Identification Card
- Alaska Driver's License
- Wells Fargo Bank Statement
- TWIC Application
- Ketchikan Public Utilities Utility Bill
- Petro Marine Services Bill
- Ketchikan Public Utilities Internet Bill
- 2007 Ford Escape Vehicle Title
- 2000 Ford Excursion Vehicle Title
- Quicken Loans Home Mortgage Statement
- Ketchikan Gateway Borough Property Taxes
- Schedule K-1 Tax Document
- Articles of Organization for Ward Country Storage
- February 2017 Predetermination Letter
- Certificate of Registration for Ward Construction
- Schedule K-1 Tax Document
- Security State Bank Statement for Ward Construction
- 2016 W-2
- Letter from Michelle Drefke
- Ketchikan Gate Borough Assessment Details
- Ward Construction LLC Biennial Report
- Articles of Organization for Ward Country Storage
- DMV Records Regarding Liens
- July 2017 Predetermination Letter
- 2015 Form 1040 (et.al.) Tax Documents
- August 2017 Termination Letter
- August 2017 COLD Overpayment Letter
- Mr. Tseu's Letter
- Form 9325 Tax Document
- 2016 Form 1040 tax document
- Individual Tax Return 2017

Despite the litany of documents and explanations provided to the contrary, Burns concluded that the Wyoming apartment was Ward's home and principal place of abode beginning in 2015 because her spouse and grandchildren lived there. However, there was no evidence provided in the COLD investigation or at trial to support the

contention that Ward ever lived in that apartment. There is no evidence to support the contention that Ward even spent the night in that apartment. Just because Ward's adult family members, adult children, and grandchildren live in the Wyoming apartment does not mean that she does. The employer's conclusion, that Ward's principal place of abode was Wyoming, is not supported by substantial evidence or reasonable belief.

3. **Whether there is substantial evidence to support AMHS's conclusion that Ward's principal place of abode was no longer Alaska because her house was for sale and whether that conclusion was based on AMHS's reasonable belief.**

To support Burns's conclusion that Ward's principal place of abode was no longer Alaska, Burns relied in part on the fact that Ward's Ketchikan home was up for sale in July 2017, roughly a week before the second predetermination hearing. Burns saw the full listing online. She used a snipping tool to send pictures from the listing to her email. Despite there being many pictures on the listing, Burns chose to only email herself pictures of empty rooms. These cherry-picked images confirmed Burns's belief that the home was "vacant." During the July 2017 predetermination hearing, Burns asked that if Alaska was Ward's home, why was the house up for sale. Ward said that she was downsizing now that the grandchildren were in Wyoming with their mother. She intended to buy a mobile home once the sale of her house went through. She could not afford to buy a new home until her current home sold. Burns asked where Ward's belongings were since the home was "vacant." Ward corrected Burns and said that they recently renovated and remodeled the upstairs floor but that her belongings were downstairs or in the garage. Ward told Burns that the house was not vacant and there were many pictures in the online listing that showed that the home was currently lived in. Burns admitted her error at trial; Ward's home in Ketchikan was not vacant.

The court's conclusion, as the trier of fact in these proceedings, is that defendant AMHS had a pre-determined disposition to find that Ward's primary place

of abode was not in Alaska, and that it skewed the evidence presented to it by the plaintiff in a manner that would ultimately support and confirm that conclusion. It is especially clear in the second predetermination hearing when the union representative asked Burns what other information the employer would like to see to prove that Alaska is Ward's principal place of abode. Burns said, "I don't need anything else" and that "in my opinion, the matter is at rest." It does not appear that Burns listened to or considered Ward's explanations or testimony. An example of this is when Burns looked at the full online listing for Ward's Ketchikan house. Despite there being many other pictures of rooms with furniture or personal items, Burns only [selected] pictures of rooms that were empty because that evidence supported her predetermined conclusion that Ward no longer lived in Ketchikan. Those pictures supported her conclusion that the home was "vacant" even though that was not actually the case.[15]

Overall, AMHS's conclusion, that Ward's principal place of abode was no longer Alaska, is not supported by substantial evidence. It is also unreasonable, based on all of the evidence and testimony, for AMHS to believe that Ward's principal place of abode was Wyoming when the bulk of the evidence available at the time the decision was made shows otherwise, specifically the fact that she had never actually lived there. "Primary place of abode" meant what AMHS wanted it to mean.

---

[15] During trial, the court appeared to notice this confirmation bias as well when it asked the State the following: "Well, [I'm] supposed to determine substantial evidence . . . [what] about if the facts are overwhelmingly on one side, and a sliver of evidence over here indicates the other? That's the position taken by the State . . . Am I foreclosed from considering something like that?"

**4. Whether AMHS's conclusion, that Ward was evasive, deceptive, or not forthright for failing to disclose both of her businesses after being asked to provide business information, was supported by substantial evidence and whether that belief was reasonable.**

It is unclear what Ward's family businesses have to do with residency or principal place of abode. In the September 2016 email, Burns asked for information about Ward's businesses. Ward provided information about Ward Country Storage but not Ward Construction. Ward explained in both predetermination hearings that she did not have much to do with the businesses. Her husband handled the businesses and took care of the taxes. Ward thought that Ward Construction and Ward Country Storage were departments or subsidiaries of the same company. This was not correct; however, it does not appear that Ward understood the complexities of the businesses. As she stated in the predetermination hearings, Ward was owner in name only; her name was listed just in case something happened to her husband. After being questioned about Ward Construction, Ward provided the information that was requested. Based on the testimony and evidence, there is not substantial evidence to support the conclusion that Ward was being evasive, deceptive, or not forthright for not disclosing both businesses and that belief is not reasonable.

**5. Whether AMHS's conclusion, that Ward was evasive, deceptive, or not forthright for failing to provide vehicle registrations, was supported by substantial evidence and whether that belief was reasonable.**

Ward provided several vehicle titles when requested. While Burns requested registrations, Ward showed signs of confusion about the difference between a title and registration. Ward said that she did not realize that a vehicle could be titled in one state and registered in another. Additionally, Ward has over 20 vehicles in her name; some are broken down, some are being driven by family members, and others are being repaired. Some vehicles, such as four-wheelers or her husband's skid steer,

are used in Wyoming, but it is unclear whether such vehicles have to be registered. Further, Ward provided explanations on more than one occasion about what vehicles she had and where they were located. She tried to account for all of them but had too many to keep track of. When Burns pulled a list of the vehicles in Ward's name from the DMV, they all appeared to be registered in Alaska and many were expired. There is not substantial evidence to support the conclusion that Ward was evasive, deceptive, or not forthright for failing to provide registrations to the vehicles in her name.

6. **Whether AMHS's conclusion, that Ward was evasive, deceptive, or not forthright for characterizing her property in Wyoming as "bare land," was supported by substantial evidence and whether that belief was reasonable.**

The issue here seems to be a misunderstanding of the property evaluation and a lack of communication between the parties. The State argues that because the words "bare land" were circled, that meant that Ward was leading them to believe that she did not have a home on that land. In her response to the September 2016 email, Ward provided many documents regarding her businesses, including a property evaluation that was recently conducted on a property she and her family own in Wyoming. On the property evaluation, 2001 Southern Drive is categorized as bare land. The property evaluation, and many other documents, list Ward Country Storage's address as 5301 Antelope Valley Street.

There are two different properties and two different addresses being talked about. 2001 Southern Drive is bare land — the Wards petitioned the City of Gillette to rezone it so they can build a housing development; 5301 Antelope Valley Street is where Ward Country Storage, the office, and the manager's apartment are located. Ward Country Storage is surrounded by bare land but is not situated on bare land. It appears that the property evaluation was misunderstood. It does not appear that any questions were asked about bare land in the predetermination hearings so Ward did not have an opportunity to explain the situation like she did at trial. The two properties

were once one parcel. The Wards split a piece off of the property to build Ward Country Storage and a road; the rest remained bare land. There is not substantial evidence to support the conclusion that Ward was evasive, deceptive, or not forthright regarding the bare land issue; it seems more like a misunderstanding, and not indicative of any intent on her part to deceive anyone. The misstatements were generally related to immaterial matters, but were construed otherwise by the employer, AMHS.

**CONCLUSION**

Based on the whole record, the court concludes that AMHS did not have just cause to terminate Ward. AMHS utilized an arbitrary standard with no clear definition, requirements, or exceptions. There was a shifting goalpost of the information that the State wanted from Ward. In the first two requests for information, Ward made a good faith effort to provide exactly what the State asked. Then, in both predetermination hearings, Ward asked what other information she needed to provide to show that her principal place of abode was Alaska. The answer was different each time. The State asked Ward to provide a multitude of evidence in support of her claim, and Ward made efforts to provide what they wanted. There was confusion about what principal place of abode meant. There were also miscommunications between the parties at various points, such as Ward providing titles instead of registrations. There were also differences in the conclusions drawn from the facts, such as whether the apartment in Wyoming was a home. But none of these instances appear to suggest that Ward acted in bad faith, was intentionally misleading, evasive, deceptive, or not forthright.

The State asked Ward to provide a multitude of documentation to show that Alaska is her primary place of abode. Then, the State determined that a manager's apartment in Wyoming was Ward's primary place of abode even though there is no evidence that she ever lived there. The bulk of the evidence supports the conclusion

Appendix
Page 41 of 42

that Alaska was Ward's principal place of abode and that she made good faith efforts to comply with the State's requests.

The court concludes that Ward was unjustly discharged from her position and is therefore entitled to damages, including reinstatement.

. . . .

***IT IS SO ORDERED.***

Dated:  June 8, 2020

_____/s/_____
Superior Court Judge William B. Carey